KEKER, VAN NEST & PETERS LLP
RACHAEL E. MENY #178514
rmeny@keker.com
LAUREN S. KANE #329375
lkane@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Plaintiff HEIDI PLUMMER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION – SANTA ANA

| | |
|---|---|
| HEIDI PLUMMER,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 8:26-CV-01479<br>**COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT**<br>Date Filed: June 10, 2026<br>**JURY TRIAL DEMANDED ON ANY CLAIM SO TRIABLE** |

## INTRODUCTION

1. On June 14, 2025, Plaintiff Heidi Plummer—a United States citizen and Orange County resident—was violently seized, handcuffed, transported away from her location, and detained by masked federal officers. This all occurred while Ms. Plummer was lawfully walking in Centennial Park in Santa Ana, California.

2. As Ms. Plummer walked in Centennial Park on a Saturday afternoon in June, masked and armed federal officers, many in tactical clothes and vests emblazoned with "ICE" on the front, rushed into a Centennial Park parking lot in numerous vans. The federal officers got out of their vans and started grabbing individuals of color, including Ms. Plummer and others nearby. Instead of asking Ms. Plummer any questions—including whether she was a United States citizen—the federal officers approached her, confiscated her phone, twisted her arms behind her back, handcuffed her, and placed her into an unmarked van with its windows blacked out.

3. After being placed into the unmarked van, federal officers transported Ms. Plummer and numerous other women away from Centennial Park and took them to a facility in downtown Santa Ana. Ms. Plummer was handcuffed the entire time she was transported in the van, handcuffed while being escorted into the facility, and handcuffed the entire time she was kept in a windowless room inside the facility. After being detained, removed, handcuffed, and denied information and bathroom access, Ms. Plummer was eventually released out onto the street, without explanation and without any assistance in getting back to her car.

4. The federal officers who detained and abducted Ms. Plummer had no lawful grounds to do so. Ms. Plummer is a United States citizen who was walking in a public park on a Saturday afternoon in Santa Ana when she was accosted by masked and armed federal officers, handcuffed, and taken from the park. She had committed no crime, was not engaged in protest activity, and was not suspected of any wrongdoing. She was also never told she was under arrest, never shown a

warrant or even an official badge. And, before being handcuffed and removed from the park, she was not asked about her citizenship status, not asked for identification and not advised of any basis for her detention.

5. The conduct of the federal officers towards Ms. Plummer violated both the U.S. Constitution and the law. Such conduct constitutes false imprisonment, assault, battery, negligence, and intentional infliction of emotional distress under California law, all of which are actionable against the United States under the Federal Tort Claims Act ("FTCA").

6. Ms. Plummer seeks to vindicate her rights. She brings this action to obtain redress for the damages and trauma she suffered due to the government's unlawful conduct, including due to the physical restraint, humiliation, fear, disruption to her work and personal life, and ongoing emotional trauma that was caused by the federal government's unlawful conduct.

## JURISDICTION AND VENUE

7. This action arises under the FTCA, 28 U.S.C. §§ 1346, 2671 *et seq*., and California common law.

8. The FTCA has an administrative exhaustion requirement under which a claimant, before filing suit, must file an administrative claim with the appropriate federal agency. If that agency does not finally dispose of the administrative claim within six months, then the claimant is deemed to have exhausted remedies. 28 U.S.C. § 2675(a). Ms. Plummer filed her administrative claims with U.S. Immigration and Customs Enforcement on November 19, 2025. On April 29, 2026, the agency denied Ms. Plummer's administrative federal tort claim.

9. The Court has subject matter jurisdiction over Ms. Plummer's FTCA claims under 28 U.S.C. § 1346(b)(1).

10. The federal officers who seized, handcuffed, transported, and detained Ms. Plummer were, on information and belief, federal "investigative or law enforcement officers" within the meaning of 28 U.S.C. § 2680(h), including federal

officers empowered by law to execute searches, seize evidence, and make arrests for violations of federal law. The United States has therefore waived sovereign immunity for claims arising out of assault, battery, false arrest, and false imprisonment committed by such federal officers.

11. The claims alleged here do not fall within the FTCA's due-care or discretionary-function exceptions. The challenged conduct was not specifically prescribed by any statute or regulation, and Defendant did not exercise due care in executing any statute or regulation. The challenged conduct was not based in legitimate policy priorities and it violated binding obligations under the U.S. Constitution, federal statutes, and other standards. Rather, on June 14, 2025, federal officers unlawfully stopped, arrested, handcuffed, transported, and detained Ms. Plummer without a warrant, without probable cause, and without reasonable suspicion based on specific articulable facts. Such conduct violated the U.S. Constitution, federal statutes and other federal standards, including but not limited to the Fourth Amendment's prohibition on unreasonable searches and seizures, as well as mandatory legal standards, including 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8. On information and belief, the conduct towards Ms. Plummer was undertaken as part of a mass increase in suspicionless detentions, stops, and arrests of people of color in California, not because any statute or regulation required or allowed federal officers to stop, detain, or arrest Ms. Plummer.

12. Venue is proper under 28 U.S.C. § 1402(b) because it is the judicial district where Ms. Plummer resides and where the acts complained of occurred.

## PARTIES

13. Plaintiff Heidi Plummer is an individual and United States citizen who resides in Orange County, California. She was born in Santa Ana and is ethnically half-Ecuadorian. She has lived and worked in Orange County her entire life and is a practicing attorney there.

14. Defendant United States is the appropriate defendant under the FTCA. 28 U.S.C. § 1346(b)(1). Defendant acted through the Department of Homeland Security ("DHS")—a "federal agenc[y]" of the United States under 28 U.S.C. § 2671—and its employees, officers, and agents, including but not limited to personnel of Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE"), subcomponent agencies of DHS under the direction, authority, and control of the Secretary of Homeland Security.

15. On information and belief, each federal officer or agent who seized, handcuffed, detained, transported, guarded, processed, and/or released Ms. Plummer was at all relevant times an employee of the United States, acting within the scope and course of their employment with DHS. To the extent any person involved in Ms. Plummer's seizure and detention is later alleged to be a contractor, the United States retained authority to control—and did in fact control—the physical performance of that person's work during the operation, including the manner of detention, transport, processing, and release. The United States is liable for its employees' negligence and for breach of duties it retained or could not delegate with respect to Ms. Plummer's stop, arrest, transport, detention, handling of her private effects, and release.

## STATEMENT OF FACTS

### A. "Operation At Large" created a regime of suspicionless immigration stops in Southern California based on racial profiling.

16. In May of 2025, public reporting confirmed that the Trump Administration ordered federal immigration agents to begin arresting "at least" 3,000 people a day.[1] Public reporting confirmed that this new target, "tripling arrest figures from earlier in 2025", was given to ICE leadership by White House

[1] J. Olivares, *Trump administration sets quota to arrest 3,000 people a day in anti-immigration agenda*, The Guardian, May 29, 2025, https://www.theguardian.com/us-news/2025/may/29/trump-ice-arrest-quota.

Deputy Chief of Staff Stephen Miller and Secretary of the Department of Homeland Security, Kristi Noem.[2]

17. By early June of 2025, DHS and its component agencies, including ICE and CBP (collectively "the government"), launched "Operation At Large" (the "Operation"), which deployed roving patrols of armed and masked immigration agents throughout Los Angeles and surrounding counties.

18. The Central District includes Los Angeles County, Ventura County, Santa Barbara County, San Luis Obispo County, Orange County, Riverside County, and San Bernardino County. Those counties have a combined estimated population of 19,233,598 people, including 9,096,334 people that identify as "Hispanic or Latino." That means people who identify as "Hispanic or Latino" make up almost half—about 47.3%—of the estimated population of the Central District.[3]

19. As described by Kyle Harvick, the Deputy Incident Commander for the Operation in Los Angeles, the Operation involved "contact teams" that "typical[ly] . . . consist of three to five agents who contact individuals in public places such as streets, sidewalks, and publicly accessible portions of businesses."[4] Harvick further explained that "[c]ertain types of businesses, including carwashes, have been selected for encounters because past experiences have demonstrated that illegal aliens utilize and seek work at these locations."[5]

20. Public reporting tied the Operation to extraordinary pressure from senior federal officials in early June 2025 to increase immigration arrests. Prior to the launch of the Operation, White House Deputy Chief of Staff Stephen Miller reportedly told federal officers in late May to "just go out there and arrest illegal aliens."[6]

---

[2] *Id.*

[3] *Vasquez Perdomo v. Noem*, 148 F.4th 656, 665 (9th Cir. 2025) (per curiam).

[4] *Id.* at 664.

[5] *Id.* at 666.

[6] E. Findell, R. Simon, M. Hackman, & T. Parti, *The White House Marching Orders*

21. Public reporting in early June 2025 also stated that senior immigration officials had recently told rank and file ICE agents to "turn the creative knob up to 11" and to think up tactics to "push the envelope."[7] Such agents were also told that, "[i]f it involves handcuffs on wrists, it's probably worth pursuing" and were encouraged to come up with new ways of increasing arrests and suggesting them to superiors.[8]

22. On June 15, 2025, President Donald Trump posted on Truth Social that ICE officers were already "facilitate[ing] a very important mission, the largest Mass Deportation Operation of Illegal Aliens in History" and that "ICE Officers are herewith ordered, by notice of this TRUTH, to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History."[9]

23. Public reporting confirmed that such immigration stops and interrogations were based on nothing but broad profiles, including on the basis of apparent race and ethnicity.[10]

24. Public reporting has also confirmed that U.S. citizens were stopped and arrested by federal agents as part of this mandate to increase arrests.[11]

---

*That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal, (June 9, 2025), https://www.wsj.com/us-news/protests-losangeles-immigrants-trump-f5089877.

[7] J. Olivares, *US Immigration Officers Ordered to Arrest More People Even Without Warrants*, The Guardian, June 4, 2025, https://www.theguardian.com/us-news/2025/jun/04/immigrationofficials-increaseddetentions-collateral-arrests.

[8] *Id*.

[9] *See* Donald J. Trump (@realDonaldTrump), Truth Social post on June 15, 2025, 5:43 pm, found at https://truthsocial.com/@realDonaldTrump/posts/114690267066155731).

[10] B. Mejia & R. Uranga, *Fears of racial profiling rise as Border Patrol conducts 'roving patrols,' detains U.S. Citizens*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-u-s-citizensdetained-indiscriminate-sweeps-home-depot-lots-targeted.

[11] *See* J. Olivares, *US citizen detained by immigration officials who dismissed his Real ID as fake*, The Guardian, May 24, 2025, https://www.theguardian.com/us-news/2025/may/24/us-citizen-detained-ice-real-id.

**B. The Operation involved stops, detentions and arrests without identification of authority or reason.**

25. Public reporting and court filings described officers participating in the Operation as wearing masks, tactical gear, utilizing unmarked vehicles, approaching people in public, physically restraining them, and transporting them away without first identifying themselves or stating a lawful basis for detention.[12]

26. For example, agents pulled up in four unmarked cars to a bus stop in Pasadena; "the doors opened and men in masks with guns started running at" three Latino men who were having their morning coffee, waiting to be picked up for work.[13]

27. In Glendale, nearly a dozen masked agents with guns "jumped out of ... cars at a Home Depot, and began 'chasing' and 'tackl[ing]' Latino day laborers without 'identify[ing] themselves as ICE or police, ask[ing] questions, or say[ing] anything else.'"[14]

28. In downtown Los Angeles, agents "'jumped out of a van, rushed up to [a tamale vendor], surrounded him, and handled him violently,' all '[w]ithout asking ... any questions.'"[15]

29. There were documented incidents where "agents approached and prevented a nonwhite individual from walking away but not those who appeared to be Caucasians."[16]

30. During this Operation, there were also other documented incidents of federal agents targeting parks in Orange County.[17]

---

[12] Public Counsel, Frequently Asked Questions re *Vasquez Perdomo v. Noem* (July 21, 2025), https://publiccounsel.org/wp-content/uploads/2025/07/Vasquez-Perdomo-FAQ_Final.pdf.

[13] *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 7 (2025) (Sotomayor, J., dissenting).

[14] *Id.*

[15] *Id.*

[16] *Vasquez Perdomo*, 790 F. Supp. 3d at 867.

[17] *See, e.g.*, City of Anaheim Municipal Government Facebook post, https://www.facebook.com/cityofanaheim/posts/pfbid0NtbrdAzSodKsFC3oXzyoya9b85w8TmKWbvYj5H5QcfdyEdQHpnHEFtRuZxkDdoRsl (noting videos of

31. Other court filings describe agents and officers as "approach[ing] suddenly and in large numbers in military style or SWAT clothing, heavily armed with weapons displayed, masked, and with their vest displaying a generic 'POLICE' patch (if any display at all)."[18]

32. The Operation "sparked 'panic and fear' across Los Angeles and its surrounding areas."[19] "Some have likened the detentions to 'kidnapping[s].'"[20]

33. By early June of 2025, the raids had gone "deep into Orange County neighborhoods," with at least fifty Orange County residents having been caught up in the immigration sweeps.[21]

**C. The illegal conduct stemming from the Operation is officially sanctioned by the government.**

34. The conduct described above was not a rogue departure from official practice.

35. Over the course of June 2025, the government reportedly made nearly 2,800 immigration-related arrests and detained many more.[22]

36. A federal district court found that the government had a policy and practice of effectuating warrantless arrests without making an individualized determination.[23] The district court further found that the government also had a policy and practice of not identifying themselves or explaining the basis for an arrest upon taking someone into custody.[24]

---

federal officers in Anaheim on Thursday, June 12, 2025).

[18] *Id.*

[19] *Noem*, 146 S. Ct. at 7 (Sotomayor, J., dissenting).

[20] *Id.*

[21] Custodio, Spencer, *Immigration Sweeps Hit a Santa Ana Neighborhood on Father's Day*, Voice of OC (June 15, 2025), https://voiceofoc.org/2025/06/immigration-sweeps-hit-a-santa-ana-neighborhood-on-fathers-day/.

[22] *Noem*, 146 S. Ct. at 7 (Sotomayor, J., dissenting).

[23] *Vasquez Perdomo*, 790 F. Supp. 3d at 867.

[24] *Id.*

37. Upon information and belief, the stop and detention of Ms. Plummer in Santa Ana on June 14, 2025 occurred during and as part of the Operation.

38. Upon information and belief, the stop-and-arrest tactics used in the Operation, including collateral arrests, masked field encounters, and handcuff-first detentions, were carried out pursuant to executive directives and operational orders to maximize immigration arrests, not because any federal statute or regulation required federal officers to seize U.S. citizens like Ms. Plummer.

39. Upon information and belief, the federal officers who seized Ms. Plummer were executing those executive and operational directives when they detained her, and were not exercising any lawful discretion to disregard the Constitution, 8 U.S.C. § 1357(a)(2), or 8 C.F.R. § 287.8.

**D. Ms. Plummer was seized and detained on June 14, 2025, while walking in Centennial Park.**

40. On June 14, 2025, Ms. Plummer attended a family memorial and afterward took a walk through Centennial Park in Santa Ana, California.

41. Sometime between approximately noon and 1 p.m., several unmarked vans pulled into a parking lot in the park near where Ms. Plummer was walking. Federal officers[25] wearing tactical gear and boots, many with their faces covered and some with "ICE" emblazoned on their gear, poured out of the vans.

42. Ms. Plummer watched these federal officers grab people nearby, handcuff them, and place them in the unmarked vans.

43. Two masked federal officers then moved toward Ms. Plummer. One of the federal officers approached Ms. Plummer without identifying himself, without displaying a badge, and without saying a word to her.

[25] Based on the information available to her at this time, Ms. Plummer believes them to be federal law enforcement officers. Regardless of their exact title, they are law enforcement officers under 28 U.S.C. § 2680(h). Ms. Plummer reserves all rights to amend her complaint if and when further information about who these particular people are is uncovered. Until then, Ms. Plummer refers to them generally throughout her complaint as "federal officers."

44. That federal officer abruptly grabbed Ms. Plummer's arms, took her phone, forced her arms behind her back, handcuffed her, walked her to where the unmarked vans were parked, and placed her in a van with blacked-out side windows.

45. The federal officers filled the van with other female detainees.

46. After the van was filled with Ms. Plummer and numerous other female detainees, a different federal officer with a covered face sat in the back facing the detained women.

47. The federal officers drove Ms. Plummer and the other detainees away from the park, for approximately ten to fifteen minutes. The van ultimately stopped at what Ms. Plummer is informed and believes is an ICE field office, located at approximately 34 Civic Center Plaza, Santa Ana, CA 92701.

48. At the federal facility, federal officers ordered Ms. Plummer and the other women out of the van while they were still handcuffed.

49. Ms. Plummer and the other women were escorted into a conference room or small office, still handcuffed, with a few chairs around the perimeter. Ms. Plummer and the women were not offered water or an opportunity to use the restroom, and the handcuffs were not removed.

50. Federal officers called detainees one by one, by name.

51. After approximately an hour and a half of being held in the small room, federal officers called Ms. Plummer's name.

52. When she stood up, a federal officer escorted her down a hallway, removed her handcuffs for the first time since she had been handcuffed in Centennial Park, returned her cell phone, and told her she was free to leave through a door in the hallway.

53. Ms. Plummer was released through a side door, onto a street near the federal facility. Ms. Plummer at first had no idea where she was and had to

determine where she was located on her phone. Ms. Plummer then had to call an Uber in order to return to her car, which remained parked at Centennial Park.

54. No federal officer asked Ms. Plummer any threshold questions before or during the seizure that would have justified the force used against her or her prolonged detention. The federal officers nevertheless continued to handcuff, transport, and detain her.

55. Once released, no federal officer offered Ms. Plummer any assistance in returning to Centennial Park.

56. The Fourth Amendment of the U.S. Constitution "imposes limits on search-and seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."[26] Longstanding law is clear that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person, and the Fourth Amendment requires that seizure be reasonable."[27] Thus, to stop an individual for brief questioning about immigration status, the government must have reasonable suspicion that the individual is illegally present in the United States.[28] Under the Fourth Amendment to the U.S. Constitution, immigration officers may stop an individual "only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the individual "may be illegally in the country."[29] Additionally, officers cannot have any reasonable suspicion based on a set of facts that "describe[s] a very large category of presumably innocent" people.[30] This includes things such as "Mexican ancestry" or being in particular locations frequented by many.[31]

---

[26] *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976).

[27] *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (internal quotation marks and citation omitted).

[28] *See id.* at 880–82; *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

[29] *Brignoni-Ponce,* 422 U.S. at 884.

[30] *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam).

[31] *Brignoni-Ponce*, 422 U.S. at 886–87 (rejecting Mexican ancestry as a basis for

57. Additionally, under federal regulations, federal immigration officers may briefly detain a person for questioning only where they have reasonable suspicion of an immigration violation based on specific articulable facts. 8 C.F.R. § 287.8(b)(2).

58. The officers who stopped Ms. Plummer lacked such reasonable suspicion, and no reasonable officer could have concluded otherwise based on the facts available at the time.

59. Immigration officers' civil immigration arrest authority extends to "aliens," not U.S. citizens. *See* 8 U.S.C. § 1226(a)(1) (providing authority only to take "any alien" into custody).[32]

60. Under federal law and regulations, federal immigration officers may also make a warrantless arrest only where they have reason to believe the person is in the United States in violation of law and is likely to escape before a warrant can be obtained. 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii).

61. Even if a person is stopped by federal officers based on reasonable suspicion, the Fourth Amendment requires that "immigration officers may [only] briefly stop the individual and inquire about immigration status. If the person is a U.S. citizen or otherwise lawfully in the United States, that individual will be free to go after the brief encounter. Only if the person is illegally in the United States may the stop lead to further immigration proceedings."[33]

62. The officers who detained, handcuffed and transported Ms. Plummer had no such reason to believe she was unlawfully present in the United States, no

---

reasonable suspicion); *Brown v. Texas,* 443 U.S. 47, 51–52 (1979) (rejecting reasonable suspicion tied to a location).

[32] *See also* U.S. Immigration and Customs Enforcement, *Immigration Enforcement Frequently Asked Questions*, https://www.ice.gov/immigration-enforcement-frequently-asked-questions (noting that ICE can "briefly detain aliens when they have reasonable suspicion that the aliens are illegally present in the United States, and arrest people they believe are illegal aliens.").

[33] *Noem v. Vasquez Perdomo*, 146 S. Ct. at 3 (Kavanaugh, J., concurring).

probable cause to arrest her, and no basis to conclude that she posed a flight risk before a warrant could be obtained.

63. Federal immigration officers are also required, as soon as it is practical and safe to do so, to identify themselves as immigration officers and to state that the person is under arrest and the reason for the arrest. 8 C.F.R. § 287.8(c)(2)(iii). The officers did not do so here. Instead, they approached Ms. Plummer in masks, said nothing, physically seized her, and transported her away without identifying themselves or offering any lawful basis for their conduct.

64. The federal officers' conduct towards Ms. Plummer on June 14, 2025 violated the United States Constitution and federal law, including but not limited to the Fourth Amendment of the U.S. Constitution, federal statutes, and federal regulations. By stopping, seizing, handcuffing, transporting, and detaining Ms. Plummer without a warrant, without probable cause, and without reasonable suspicion based on articulable facts, federal officers subjected her to an unreasonable seizure in violation of the U.S. Constitution, federal statutes, and federal regulations.

65. In sum, Ms. Plummer was stopped by masked federal officers without any warrant, probable cause, or reasonable suspicion based on articulable facts that she had committed any offense or was unlawfully present in the United States. The federal officers then stripped her of her phone, handcuffed her, transported her, and detained her for approximately 90 minutes before any government official even identified themselves to her or asked her any question at all.

**E. Ms. Plummer continues to suffer today as a result.**

66. The federal government's racial profiling has consequences beyond immigration enforcement. Kevin R. Johnson, the director of Aoki Center on Critical Race and Nation Studies at UC Davis School of Law, explained that "race-based

immigration enforcement undermines Latina/o sense of belonging in the national community for generations."[34]

67. As a direct and proximate result of the government's conduct, Ms. Plummer has suffered and continues to suffer economic loss and personal injuries, including but not limited to out-of-pocket expenses, difficulty sleeping, difficulty working, emotional trauma, humiliation, anxiety, depression, fear of being alone or in crowds, and loss of enjoyment of life.

68. Immediately following her detention, Ms. Plummer frequently cried from the stress of what happened to her. She could not believe what had happened to her and did not understand why it had happened. She had trouble sleeping and would often wake up thinking she was being detained again.

69. Ms. Plummer also suffered economic losses, including the cost of transportation back to her car at Centennial Park after release and other costs incurred while seeking support and recovery after the incident.

70. At the time of the incident, her romantic partner was in Argentina. Ms. Plummer spent substantial resources to fly to Argentina so she could be comforted by her partner and avoid being left alone with the trauma of the experience.

71. The ordeal also disrupted Ms. Plummer's work. She was too upset to attend work for a week. Her law partner had to take over most of her legal work for more than a month while she processed what had happened to her. Her work has continued to suffer after the event.

72. Ms. Plummer stopped attending community and legal events. Ms. Plummer is active in the Orange County legal community and holds numerous leadership roles. The detention interfered with her ability to participate in the professional and community activities that are important to her career and public

[34] W. Fry and S. Olmos, *Supreme Court allows immigration agents to resume 'roving patrols' in LA, siding with Trump*, Cal Matters, https://calmatters.org/justice/2025/09/la-immigration-sweeps-supreme-court/.

standing. She felt humiliated and believed her reputation in the local legal community had been tarnished.

73. Ms. Plummer continues to suffer severe emotional distress to this day. She loses sleep, still waking up in the middle of the night thinking she is being detained. She has become anxious and fearful of being in public alone or in crowds. She continues to see a therapist on a weekly basis to work on her trauma stemming from the events of June 14, 2025.

## CLAIMS FOR RELIEF

## COUNT I

***FTCA: False Imprisonment / False Arrest***
***Against Defendant United States***

74. Ms. Plummer repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

75. In California law, false imprisonment consists of the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable period of time, however brief.

76. The federal officers intentionally confined Ms. Plummer by physically grabbing her, handcuffing her, taking her phone, placing her in a van, transporting her to what she believes to be a government facility, and further detaining her there.

77. At no point did Ms. Plummer consent to that confinement.

78. The confinement was without lawful privilege or legal authority. On information and belief, the federal officers lacked a warrant, lacked probable cause, and lacked reasonable suspicion based on specific articulable facts that Ms. Plummer had committed any offense or was unlawfully present in the United States. No federal officer had reasonable cause to believe the arrest was lawful.

79. Even if federal officers contend they were conducting an investigative stop, the methods used were far more intrusive than a brief stop for questioning. The federal officers handcuffed Ms. Plummer, confiscated her phone, transported

her to another location, held her for approximately 90 minutes, and never asked the threshold questions that would have immediately dispelled any supposed suspicion.

80. A private person would be liable to Ms. Plummer under like circumstances for torts under the laws of California.

81. As a direct and proximate result of the false imprisonment, Ms. Plummer suffered damages.

**CLAIMS FOR RELIEF**
**COUNT II**
***FTCA: Assault***
***Against Defendant United States***

82. Ms. Plummer repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

83. Under California law, assault occurs when a defendant intentionally acts in a way that causes another person reasonably to believe she is about to be touched in a harmful or offensive manner.

84. The federal officers, wearing masks and tactical gear, rushed into the park, seizing nearby people, and then advanced on Ms. Plummer.

85. A federal officer then grabbed Ms. Plummer, confiscated her phone, placed her arms behind her back, and handcuffed her.

86. Ms. Plummer reasonably believed she was about to be and was in fact subjected to harmful and offensive contact.

87. The federal officers acted without lawful privilege or legal authority. The federal officers lacked a warrant, lacked probable cause, and lacked reasonable suspicion based on specific articulable facts that Ms. Plummer had committed any offense or was unlawfully present in the United States.

88. A private person would be liable to Ms. Plummer under like circumstances for torts under the laws of California.

89. As a direct and proximate result of the assault, Ms. Plummer suffered damages.

**CLAIMS FOR RELIEF**
**COUNT III**
***FTCA: Battery***
***Against Defendant United States***

90. Ms. Plummer repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91. Under California law, battery consists of an intentional and harmful or offensive touching of another person without consent or lawful privilege.

92. The federal officers intentionally touched Ms. Plummer in a harmful and offensive manner by confiscating her phone, grabbing her arms, forcing her arms behind her back, handcuffing her, placing her in a van and transporting her away from the park, and physically moving and restraining her.

93. Ms. Plummer did not consent to the contact.

94. The federal officers acted without lawful privilege or legal authority. The federal officers lacked a warrant, lacked probable cause, and lacked reasonable suspicion based on specific articulable facts that Ms. Plummer had committed any offense or was unlawfully present in the United States.

95. A private person would be liable to Ms. Plummer under like circumstances for torts under the laws of California.

96. As a direct and proximate result of the battery, Ms. Plummer suffered damages.

**CLAIMS FOR RELIEF**
**COUNT IV**
***FTCA: Intentional Infliction of Emotional Distress***
***Against Defendant United States***

97. Ms. Plummer repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

98. In California, a plaintiff states a claim for intentional infliction of emotional distress by alleging that the defendant caused severe emotional distress by committing extreme and outrageous conduct with the intent to cause emotional

distress or with reckless disregard of the near certainty that such distress would result.

99. The government intended to leverage the trauma of its immigration sweeps as a deterrent. Its conduct in stopping people based only on ethnicity, skin color, or language, and silently handcuffing, detaining, and arresting people and taking them away in unmarked vans separated by gender evinces, at worst, the government's intent to increase suffering to maximize the deterrent of Operation At Large, and at best, its reckless disregard for the well-being of the people it kidnapped.

100. The conduct directed at Ms. Plummer personally was extreme and outrageous. Armed, masked federal officers silently rushed her in a public park, physically seized her without warning, took her phone, handcuffed her, placed her in a van with blacked-out windows, transported her to an unknown government facility, denied her information and restroom access, and then released her without explanation.

101. This conduct exceeds all bounds usually tolerated in a civilized community.

102. By stopping, seizing, handcuffing, transporting, and detaining Ms. Plummer without a warrant, without probable cause, and without reasonable suspicion based on articulable facts, federal officers subjected her to an unreasonable seizure in violation of the U.S. Constitution, federal statutes, and federal regulations.

103. The federal officers intended to cause distress or, at minimum, acted with reckless disregard of the near certainty that such conduct would cause severe emotional distress.

104. The Operation of which Ms. Plummer's detention was a part was designed to maximize fear, coercion, and deterrence through aggressive tactics. The government conducted Operation At Large to deter immigration and to

convince immigrants to self-deport; inflicting trauma was the point. Even if the government did not so intend, it knew or should have known that its Operation would inflict such trauma, and it implemented the Operation anyway.

105. The federal officers' conduct caused Ms. Plummer severe emotional distress, including trauma, persistent fear, anxiety, humiliation, sleep disturbance, and ongoing need for therapy.

106. A private person would be liable to Ms. Plummer under like circumstances for torts under the laws of California.

107. As a direct and proximate result of this conduct, Ms. Plummer suffered damages.

## CLAIMS FOR RELIEF
## COUNT V
### *FTCA: Negligence*
### *Against Defendant United States*

108. Ms. Plummer repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

109. In California, negligence requires a showing of duty, breach, causation, and harm.

110. The federal officers owed Ms. Plummer a duty to use ordinary care in carrying out any investigative stop, arrest, transport, and detention, and a duty not to subject her to unreasonable and unnecessary harm.

111. One or more unidentified federal officers breached their duties, including by (1) detaining Ms. Plummer without reasonable suspicion or probable cause, (2) failing to identify themselves and state the reason for her arrest or detention, (3) using handcuffs and custodial transport without lawful justification, (4) confiscating Ms. Plummer's phone without lawful justification, (5) failing to ask basic questions that would have immediately revealed that Ms. Plummer was a United States citizen and not a proper subject of immigration arrests, (6) detaining Ms. Plummer for approximately 90 minutes after transporting her to a federal

facility without lawful justification, (7) denying her water and restroom access while detained, and (8) releasing her without explanation or assistance in returning to the place where she had been seized.

112. The federal officers acted without lawful privilege or legal authority. The federal officers lacked a warrant, lacked probable cause, and lacked reasonable suspicion based on specific articulable facts that Ms. Plummer had committed any offense or was unlawfully present in the United States.

113. A private person would be liable to Ms. Plummer under like circumstances for torts under the laws of California.

114. As a direct and proximate result of these breaches, Ms. Plummer suffered the injuries and damages alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Plummer prays that this Court grant the following relief:

115. Compensatory damages for injuries caused by Defendant, including physical injury, pain, discomfort, fears, anxiety, and other mental and emotional distress suffered by Ms. Plummer and for similar suffering reasonably certain to be experienced in the future;

116. Attorneys' fees and costs as allowed by law, including by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

117. Such other and further relief as the Court may deem fit and proper.

## DEMAND FOR JURY TRIAL

FTCA claims are tried to the Court without a jury. *See* 28 U.S.C. § 2402. Ms. Plummer demands a jury trial on any claims that are, at the time of trial, triable by jury, including but not limited to, whether because of a change of law or an amendment to the pleadings.

Dated: June 10, 2026

KEKER, VAN NEST & PETERS LLP

By: */s/ Rachael E. Meny*
RACHAEL E. MENY
LAUREN S. KANE

Attorneys for Plaintiff HEIDI PLUMMER